# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7387 | **DATE** | 5/1/2003 |
| **CASE TITLE** | | Jackson vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Order. The ALJ's decision is reversed pursuant to 42 U.S.C. section 405(g), and this action is remanded for further proceedings consistent with this opinion. The parties' motions for summary judgment (docket entry[2-1] and [14-1]) are both denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | MAY 0 5 2003 | | |
| | Notified counsel by telephone. | | | date docketed | | 18 |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| mm | courtroom deputy's initials | | | | mailing deputy initials | |

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAY 0 5 2003

| | | |
|---|---|---|
| CHARLOTTE JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 01 C 7387 |
| | ) | |
| JO ANNE B. BARNHART,[1] Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiff Charlotte Jackson seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3). This matter is before the Court on the parties' cross-motions for summary judgment. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). For the reasons set forth below, the case is remanded for further proceedings consistent with this opinion.

---

[1]     On November 9, 2001, Jo Anne B. Barnhart became the Commissioner of Social Security. Ms. Barnhart is automatically substituted for Larry Massanari as the defendant in this action. Fed. R. Civ. P. 25(d)(l); 42 U.S.C. §405(g).



## PROCEDURAL HISTORY

On July 14, 1998, Jackson applied for DIB and SSI benefits claiming that she became disabled on November 10, 1997 due to back pain.[2] (R. at 50-52, 253-55.) The Commissioner denied Jackson's application initially and upon reconsideration. (R. at 36, 42, 262, 257.) Jackson appealed the Commissioner's decision and requested an administrative hearing, which was held on June 11, 1999. (R. at 45, 288-308.) On October 28, 1999, the Administrative Law Judge ("ALJ") denied Jackson's claims for DIB and SSI, finding that she was not disabled because she could perform her past relevant work. (R. at 19-25.) On August 14, 2001, the Appeals Council denied Jackson's request for review (R. at 7-8), and the ALJ's decision therefore became the final decision of the Commissioner. *See* 20 C.F.R. §416.1481.

## FACTUAL BACKGROUND

Jackson was born on December 5, 1939. (R. at 294.) She has a tenth grade[3] education and obtained her GED in 1982. (R. at 64.) In 1990, she was diagnosed with diabetes and hypertension and immediately began taking insulin. (R. at 237.) In addition, Jackson injured her lower back in a car accident in 1993, and again while lifting furniture in August 1996. (R. at 150.) Jackson's present claims relate to a third back injury she sustained in November 1997 while lifting her granddaughter. (R. at 60-61, 237.)

---

[2]     Jackson's previous application for DIB dated January 20, 1998 was denied initially and upon reconsideration. (R. at 20, 47, 292.) Jackson has not sought further review of that decision.

[3]     At the hearing, Jackson testified that she had completed school through the eighth grade. (R. at 294.)

## A.    Medical Evidence

Dr. Eugene Loftin is board certified in internal medicine and has been Jackson's treating physician since 1993.  (R. at 61, 232.)  On November 13, 1997, Jackson went to Dr. Loftin and complained that she had been suffering from back pain since November 10, 1997.  (R. at 138.) Jackson returned to Dr. Loftin on December 1 and 11, 1997, because her back was "very painful," and Dr. Loftin diagnosed her with low lumbar strain with tenderness.  (R. at 136.)  He prescribed her Voltran and Flexeril for pain and sent her to physical therapy.  (R. at 135, 136, 172.)

On January 19, 1998, Dr. Loftin saw Jackson again for her diabetes and hypertension management, and for a "diffuse lumbar sprain."  (R. at 134.)  Jackson reported that her pain was "no better" at that time.  Dr. Loftin gave her a prescription for Flexeril and Naprosin and ordered an MRI of her lumbosacral spine, which she had on January 28, 1998.  (R. at 129, 134.)  The radiology report showed evidence of degenerative changes in the lumbar spine with "disk bulge at L4-5 central and to the left."  (*Id.*)

Pursuant to Dr. Loftin's orders, Jackson attended nine physical therapy sessions for pain relief and strengthening between December 22, 1997 and February 16, 1998.  (R. at 172.)  The initial physical therapy evaluation on December 22 revealed that Jackson had back pain at a level of 4 out of ten points (4/10) which was "present daily and worse with bending, sitting, sit to stand, and lying down."  (R. at 177.)  Jackson's straight leg raise was "40 degrees to the right with pain and 70 degrees to the left" and she had "poor pelvic stability bilaterally, worse on the right."  (*Id.*)  The physical therapist observed that Jackson was "slow and guarded" when standing up from a sitting position and that she walked "slowly with wide base."  In addition,

3

Jackson was unable to "single leg stance [on] either leg [for] more than 2 sec[onds]." (*Id.*) Jackson's back area was tender and the physical therapist concluded that she had "lumbar bilat[eral] pain with no radiating symptoms" resulting from her attempt to lift her granddaughter in November 1997. (R. at 176-78.) Several weeks later when the physical therapist discharged Jackson, Jackson "demonstrated good lifting techniques" but had not achieved the physical therapy goal to be pain free. (R. at 172.) At that time, Jackson still reported that she had pain which woke her up at least twice a night even though she took pain medication. (*Id.*)

On March 6, 1998, Jackson saw Dr. Loftin again for her "continuous back problem." (R. at 218.) Jackson was still taking medication for her diabetes and hypertension, as well as Voltran and Flexeril for pain. (*Id.*) According to Dr. Loftin's notes, Jackson called him on May 14, 1998, to ask for a note to return to work. (R. at 213.) Dr. Loftin noted that he needed to reexamine her back and that she was not yet released for work. (*Id.*) On May 21, 1998, Dr. Loftin again prescribed Jackson Flexeril for pain and referred her for another round of physical therapy. (*Id.*)

Jackson attended twenty-three physical therapy sessions between June 2 and August 19, 1998. (R. at 201.) On or about June 22, 1998, the physical therapist, Jodi Quinn, sent Dr. Loftin a letter stating that since Jackson had begun her therapy, she had increased her spinal range of motion by 50 percent, improved her posture from "poor to fair+/good-," and decreased her constant pain from 8/10 to a range of 3-6/10. (R. at 212.) Jackson had also begun to exercise on a Swiss ball, without residual pain. (*Id.*) Quinn recommended an additional three to four weeks of therapy.

At the time of her discharge on August 19, 1998, Jackson's pain level had decreased from "8/10 to 3-4/10" with pain worse on her right side. (R. at 201.) Jackson's "main pain generator" was sitting, and she was only able to manage the pain with medication. (*Id.*) The physical therapist reported that Jackson's range of motion and trunk stability had improved, but that she still could not sit for more than 15 minutes without pain. (*Id.*) The physical therapist also noted that despite Jackson's progress, she had not achieved the treatment goals of "good unsupported sitting posture" and full extension range of motion. (*Id.*)

On August 28, 1998, Dr. Kyung W. Koo, board certified in internal medicine and specializing in pulmonary diseases and internal medicine, performed a consultative examination of Jackson at the request of the Illinois Bureau of Disability Determination Services. (R. at 189, 231.) Dr. Koo reported that in November 1997, Jackson complained of lower back pain radiating down the lateral aspect of her left thigh, and numbness in her left foot. (R. at 189.) He noted that Jackson's January 1998 MRI scan revealed "bulging of the disc centrally," and that she was treated with physical therapy. (*Id.*)

Dr. Koo did not find any deformity of Jackson's spine or tenderness in her back, and he indicated that she could bend forward up to 40 degrees and backwards up to 20 degrees. (R. at 190.) However, Dr. Koo found that Jackson had developed "lower back pain radiating down the left thigh," and that her pain was "mainly due to strain of the lower back." (*Id.*) He observed signs of peripheral neuritis[4] in both her lower extremities, "probably due to diabetes mellitus," and he noted that her hypertension "[did] not appear to be well controlled." (*Id.*)

---

[4]     *Peripheral neuritis* is the inflammation of one or more peripheral nerves. WEBSTER'S MEDICAL DESK DICTIONARY 531 (1986).

The following month on September 11, 1998, Dr. Jose Luis Gonzalez completed a residual functional capacity assessment of Jackson. (R. at 191.) Dr. Gonzalez did not personally examine Jackson and was not her treating physician. In describing her symptoms, Dr. Gonzalez indicated that Jackson "complain[ed] of back pain that radiates to her mid-thigh," but that her back "revealed no deformity of the spine and no tenderness on the back." (R. at 197.) According to Dr. Gonzalez, Jackson could bend forward up to 40 degrees and backwards up to 20 degrees, with lower back pain. (R. at 198.) Dr. Gonzalez also stated that Jackson had full range of motion in all other areas and could walk without an assistive device, and that the "rest of [the] exam [was] unremarkable." (*Id.*)

Based on this information, Dr. Gonzalez concluded that Jackson could lift 50 pounds occasionally and 25 pounds frequently, and that she could sit and stand for approximately six hours in an eight hour workday. (R. at 192.) Dr. Gonzalez stated that Jackson occasionally had postural limitations with respect to climbing, balancing, stooping, kneeling, crouching, and crawling (R. at 193), but she had no manipulative, visual, communicative, or environmental limitations. (R. at 194-95.) In making his assessment, Dr. Gonzalez did not examine any treating or examining source statements regarding Jackson's physical capacities, and he did not complete the portion of the form that requested him to explain how the medical records he reviewed supported his conclusions about Jackson's residual functional capacity. (R. at 193, 197.)

Jackson returned to Dr. Loftin on October 1, 1998, complaining of back pain. (R. at 199.) Dr. Loftin noted that Jackson had a "diffuse lumbar" which was "tender to palpation." (*Id.*) Jackson saw Dr. Loftin for back pain again on January 26, 1999, and he referred her to physical

therapy for a third time. (R. at 242.) Jackson attended five physical therapy sessions between February 2 and March 12, 1999. (R. at 240.) The physical therapist noted that upon discharge, Jackson's pain was at an intensity of 4/10, down from 5/10. (*Id.*) Jackson's range of motion had generally improved and according to the discharge summary, her forward bending had increased from 50 percent to 75 percent, her back bending had increased from 20 percent to 90 percent, and her side bending had increased from 75 percent to 100 percent. (*Id.*) The physical therapist noted that Jackson's strength in her lower extremities had improved from 3-4/5 to 4/5, and that her ability to sit had increased from 15 to 20 minutes. (*Id.*)

On March 16, 1999, Dr. Sapna Rathi conducted a neurological evaluation of Jackson at the request of Dr. Loftin. (R. at 237.) Dr. Rathi noted Jackson's history of insulin-dependent diabetes and hypertension, and reported that she complained of chronic, intermittent, muscle spasms in both sides of her lower back and numbness in the last three toes of her left foot. (*Id.*) Jackson told Dr. Rathi that she was taking Naprosin and Flexeril for the pain but that the Flexeril made her very drowsy. (*Id.*) Dr. Rathi noted that Jackson's January 1998 MRI showed "degenerative changes in the lumbar spine with disc bulge at L4, L5 central and to the left," but did not show any evidence of "disc extrusion or high grade central canal stenosis." (R. at 238.)

Dr. Rathi's physical examination revealed that Jackson's strength level was "4+ to 5- out of 5 in the upper extremities both proximally and distally except for left grip which was about a 4 out of 5," and 5 out of 5 "both proximally and distally" in her lower extremities. (*Id.*) Dr. Rathi indicated that Jackson's cranial nerves were "intact with sharp discs and full visual fields." (*Id.*) She showed "decreased vibration" in both feet and "decreased pin prick in a stocking glove

distribution in the hands and feet." However, her "[l]ight touch and proprioception[5] were intact." (*Id.*) According to Dr. Rathi, Jackson's gait was normal and she was "able to ambulate on her heels, toes, and tandem gait." (*Id.*) In addition, Jackson's Romberg's sign[6] and straight leg raise were both negative. (R. at 238.)

Dr. Rathi's impression was that Jackson had chronic lower back pain, most likely secondary to muscle spasm. (R. at 238.) He noted that Jackson's MRI of the lumbosacral spine was unremarkable for radiculopathy[7] or herniated disc, but he diagnosed her with diabetic peripheral neuropathy.[8] (*Id.*) Dr. Rathi recommended that Jackson undergo an EMG test of the lower extremities to evaluate her chronic lower back pain and to rule out radiculopathy. (R. at 239.) He also recommended a nerve conduction study "for further work up of [her] diabetic peripheral neuropathy," and exercises to help manage her lower back pain and build up the paraspinal muscles. (*Id.*) Dr. Rathi advised Jackson to continue taking Flexeril and Naprosin as needed to control her back pain. (*Id.*)

---

[5]  *Proprioception* is the reception of stimuli produced within the organism. WEBSTER'S MEDICAL DESK DICTIONARY 579 (1986). Loss of proprioception abolishes or seriously impairs the capacity for independent locomotion. MAURICE VICTOR, M.D. & ALLAN H. ROPPER, M.D., ADAMS AND VICTOR'S PRINCIPLES OF NEUROLOGY 123 (McGraw-Hill, 7th ed. 2001).

[6]  *Romberg's sign* is a diagnostic sign of diseases of the nervous system consisting of a swaying of the body when the feet are placed close together and the eyes are closed. (*Id.*)

[7]  *Radiculopathy* is a pathological condition of the nerve roots. (*Id.* at 169.) If pain is present, it may be intensified by movement of the spine and radiates in a proximal-distal direction, frequently giving rise to "shooting pains" and burning sensations. (*Id.*)

[8]  *Neuropathy* is an abnormal and usually degenerative state of the nervous system or nerves. (*Id.* at 1396-99.) Neuropathy is most common in diabetics more than 50 years of age. (*Id.*) The prevailing view is that there is some relationship between peripheral nerve damage and inadequate regulation of the diabetes. (*Id.*)

8

On May 4, 1999, Jackson underwent an EMG that revealed mild bilateral lumbosacral radiculopathy, poorly localized, but no peripheral neuropathy in the lower extremities. (R. at 252.) Around that time, Dr. Loftin noted that Jackson had some complaints about her vision – something she first mentioned back in August 1996 when she reported feeling "a hair" in the outer corners of both eyes. (R. at 150, 269.) Dr. Loftin's May 22, 1999 notes indicate that his nurse was trying to obtain an eye doctor referral from Jackson's insurance company.[9] (R. at 269.) Two days later on May 24, 1999, Jackson complained to Dr. Loftin that she was experiencing blurred vision and that she was concerned because of her diabetic history. (R. at 245.)

In June 1999, Jackson saw Dr. Antonio C. Yuk. (R. at 267.) Dr. Yuk reported that Jackson's hyperextension was 30 degrees, her lateral rotation was over 45 degrees, and her lateral flexion was 30 degrees. (*Id.*) Dr. Yuk noted that Jackson's straight leg raise testing was negative for both legs, and that neurologically, he did not find cranial nerve change. (R. at 267.) He also indicated that Jackson had good motor and sensory functions in her upper extremities, and that there was no "focal atrophy or weakness" in her lower extremities. (*Id.*) Dr. Yuk did not find any proprioception loss, and he determined that Jackson could perform heel toe and tandem gait without any difficulty. However, a sensory examination showed that Jackson had some numbness in the third and fourth toes of her left foot and she appeared to have some "vibratory sensation loss in the distal lower extremities." (*Id.*)

After reviewing Jackson's January 1998 MRI scan, Dr. Yuk did not perceive any serious structural abnormality that could be causing neural compromise, but he did notice that there were

---

[9]      On July 23, 1998, Dr. Loftin referred Jackson to ophthalmologist W. Raiff, M.D. for "suspicious optic nerve" and possible glaucoma. (R. at 203.) The record does not reveal whether Jackson followed up with Dr. Raiff.

some degenerative changes which were more notable at the L4-5 level. (R. at 267.) Although

Dr. Yuk opined that the degree of structural abnormality on the MRI scan from a year ago "was

not severe enough to warrant aggressive surgical intervention," he recommended epidural steroid

injections to control Jackson's pain. (*Id.*)

## B.    Jackson's Testimony

Jackson testified that she has no special training beyond her GED. (R. at 294.) She lives

alone and during the week is only able to cook in a microwave and on a table top grill. (R. at

297.) In addition, she only drives a car when necessary, which is not often. (R. at 296.)

Jackson's daughter lives nearby and on weekends she helps Jackson with the laundry,

housework, shopping, and cooking. (R. at 293, 297, 300.)

Jackson testified that she has never had back surgery but she sees a doctor "about every

three months or when needed." (R. at 296-97.) She stated that she injured her back while lifting

her granddaughter. (R. at 296.) Jackson explained that the pain occurs in the right side of her

back, over her buttock, radiating halfway down from her hip to her knee. (R. at 301.) According

to Jackson, the pain is constant and it worsens over time. (*Id.*) She testified that she can walk

approximately half a block before she has to stop because of pain, and prolonged sitting, bending

and standing causes her pain. (R. at 298, 300-01.) To alleviate her back pain, Jackson performs

daily leg exercises at home on the advice of her physical therapist. (R. at 296.) She also takes

Flexeril and other medications, attempts to walk around, and lies on a bed or on a recliner using a

body pillow approximately three times a day for about an hour at a time. (R. at 298, 304.)

In addition to her back pain, Jackson also experiences headaches from looking at a

computer monitor and she has high blood pressure. (R. at 299, 302.) She cannot walk up and

down the stairs because she is afraid that she may fall due to her poor balance and weak knees which "buckle" at times. (R. at 302.) Jackson testified that she has been an insulin-dependent diabetic since 1990 (R. at 302), and that the toes on her left foot are numb most of the time. (R. at 303.) She does not experience a loss of sensation in her fingers, but she does experience numbness in her hands and has arthritis in her left arm. (R. at 303.) According to Jackson, she "was told" that she has cataracts, and she has blurry vision and difficulty reading text on a computer monitor. (*Id.*)

Jackson stated that she worked as a customer service representative for approximately fifteen years. (R. at 295-96.) She described the job as requiring her to answer telephone inquiries (R. at 295), sit for at least seven hours performing data entry on a computer (R. at 294-95), and bend in order to use the copier and the file cabinet. (R. at 298.) A few months after her injury in April 1998, Jackson briefly returned to work. She initially worked for only two hours per day, then increased to four, then six and finally a full eight hours. (*Id.*) However, after working for six hours, Jackson began experiencing headaches, blurred vision, and back pain from bending and prolonged sitting. (*Id.*) She testified that she tried to alleviate her pain by standing up to change positions, but because she had to answer the telephone and enter data into the computer, she had to sit down again. (*Id.*) Jackson decided to stop working after one month because she could not "handle the work" due to pain. (R. at 300.)

## C.    Vocational Expert Testimony

Edward Pagella, a vocational expert ("VE"), testified that Jackson's past work was unskilled "due to the fact that it took her less than 30 days to learn how to perform the position at the sedentary level of physical tolerance." (R. at 306.) The VE stated that Jackson could do her

past relevant work if she was able to lift 50 pounds occasionally and 25 pounds frequently, and sit for six to eight hours a day. (*Id.*) He also stated, however, that Jackson would not be able to do her past relevant work if she experienced a lot of discomfort and blurry vision, and was unable to do "any more than she alleges." (R. at 306-07.) The VE explained that given Jackson's age, education and background, she would not be able to perform any other work in the national economy besides being a telephone customer service representative. (R. at 307.)

## D.    The ALJ's Findings

The ALJ found that Jackson suffered from a history of back problems, hypertension, diabetes, diabetic peripheral neuropathy, and blurred vision. (R. at 24.) However, he concluded that she did not have an impairment or combination of impairments that were listed in, or medically equal to the impairments listed in the Social Security Regulations. (R. at 25.) *See* 20 C.F.R. pt. 404, subpt. P, app. 1, Regs. No. 4. As a result, the ALJ assessed Jackson's residual functional capacity and determined that she could perform her past relevant work as a customer service representative. (R. at 23, 24-25.) Specifically, the ALJ found that Jackson could perform the physical exertional requirements of medium work, which included the ability to stand, sit, and walk for at least six hours in an eight-hour work day, and the ability to push, pull, grip, grasp, and manipulate without limitations. (R. at 25.)

In making this determination, the ALJ rejected Jackson's testimony regarding her symptoms and limitations as inconsistent with, and unsupported by, the objective clinical evidence and the record considered as a whole. (R. at 25.) He found that the medical records did not reflect any severe diabetic or hypertensive complications and that her diabetic neuropathy did not significantly affect her ability to stand, walk, or use her upper extremities for gripping,

12

grasping, manipulating, pulling, or pushing. (R. at 22-23.) In addition, the ALJ noted that

Jackson did not have venous distention in her lower extremities, serious peripherovascular

disease, serious arterial sclerosis, congestive heart failure, or any significant impairment of her

renal functions. (R. at 23.) In the absence of functional limitations from her diabetes and

hypertension, the ALJ stated, Jackson's limitations could not be considered severe, disabling

impairments. (R. at 23.)

 The ALJ acknowledged that Jackson complained to Dr. Loftin about blurred vision, but

Dr. Loftin's notes did not reveal that he actually examined Jackson's eyes. (R. at 22.) In

addition, Dr. Rathi did not find any serious abnormalities of Jackson's eyes when he examined

her in March 1999. To the contrary, Dr. Rathi indicated that she had "sharp discs and full visual

fields." (*Id.*) In light of this evidence, the ALJ concluded that Jackson's assertions of blurred

vision were unreliable and that the condition was not a severe impairment. (*Id.*) The ALJ did

find that Jackson experienced "some degree of low back pain" and "some degree of functional

limitations . . . of the lumbar spine," but it was not a sufficient impairment to render her

automatically disabled under the regulations. (R. at 23.) Thus, the ALJ considered whether

Jackson had the residual functional capacity to perform any work.

 On this point, the ALJ agreed with Dr. Gonzalez's determination that Jackson could

perform medium work activities on a regular and continuous basis. (R. at 23.) In reaching this

conclusion, the ALJ considered the reports of Jackson's treating and examining physicians. (*Id.*)

According to the ALJ, these reports showed that Jackson had a history of physical therapies for

her back but the treatment "remained entirely conservative." (R. at 23-24.) The ALJ noted that

despite her various back complaints, Jackson was "fully ambulatory without actual inability to

bear weight," and she had full use of her upper extremities. (R. at 24.) The ALJ also found that

Jackson had showed significant improvement during her physical therapy sessions. (*Id.*) In fact,

as of March 16, 1999, Jackson's neurological examination indicated that she was not "in any

apparent distress." (*Id.*) And though Jackson appeared to suffer some side effects from taking

Flexeril, the ALJ found that she did not always take medications that would cause drowsiness or

other such side effects that would prevent her from working. (*Id.*)

As for Jackson's complaints that she could not sit for prolonged periods of time, the ALJ

found that the medical reports "d[id] not show the necessary signs and findings of a back

disorder that would not allow her to sit for . . . at least six hours in an eight hour work day." (R.

at 24.) The ALJ also noted that Jackson was able to take care of her personal needs and "get out"

on a regular or continuous basis. (*Id.*) In addition, the ALJ personally observed Jackson during

the hearing and saw that she was able to ambulate unassisted and sit for "a period of time." (*Id.*)

Thus, he refused to give significant weight and consideration to Jackson's complaints of pain.

(*Id.*)

## DISCUSSION

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is governed by §205(g) of the Social

Security Act. *See* 42 U.S.C. §405(g). The ALJ's findings are generally entitled to great

deference because the ALJ, not the court, is responsible for weighing conflicting evidence and

for making a final determination of whether the claimant is disabled. *See Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000) (court may not "reweigh the evidence, or substitute [its] own

judgment for that of the Commissioner"). The Court may reverse the ALJ's decision "only if the

evidence 'compels' reversal, not merely because the evidence supports a contrary decision." *Betancourt v. Apfel*, 23 F. Supp. 2d 875, 880 (N.D. Ill. 1998) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

At the same time, the court cannot act as an uncritical "rubber stamp" for the Commissioner's decision and should only affirm findings of fact when they are supported by substantial evidence. *Howell v. Sullivan*, 950 F.2d 343, 347 (7th Cir. 1991); *Hereford v. Shalala*, 48 F.3d 1221 (7th Cir. 1995). Substantial evidence includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In social security disability hearings, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)). Failure to fulfill this duty constitutes good cause to remand for gathering of additional evidence. *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981).

## B.     Five-Step Inquiry

A person is disabled within the meaning of the Social Security Act if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §416.905. In determining whether a claimant suffers from a disability, the ALJ must conduct a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant

unable to perform any other work? *See* 20 C.F.R. §§404.1520, 416.920; *Clifford*, 227 F.3d at 868.

A claimant will automatically be found disabled if she makes the requisite showing at steps one through three. *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 n.3 (7th Cir. 1999); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). If the claimant is unable to satisfy step three, she must then show that she is unable to perform her prior job. *Henderson*, 179 F.3d at 512 n.3. If she makes this showing, the burden then shifts to the Commissioner to show that the claimant has the ability to engage in other work existing in significant numbers in the national economy. *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

## C.    Analysis

Jackson argues that the ALJ made the following errors in deciding her case: (1) he improperly relied on the opinion of a non-examining physician; (2) he improperly determined that she maintained the residual functional capacity to perform the physical exertional requirements of medium work; and (3) he improperly dismissed her diabetic neuropathy condition as being non-severe. The Court addresses each argument in turn.[10]

---

[10]      In support of her arguments, Jackson offers certain medical records that she submitted to the Appeals Council after the ALJ's decision but before the Appeals Council denied her request for reconsideration. The Court cannot consider these records because (1) they were not reviewed by the Appeals Council and were not before the ALJ during the administrative hearing, *Eads v. Secretary of Department of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ "cannot be faulted for having failed to weigh evidence never presented to him"), and (2) Jackson has not pursued a request for reexamination of the ALJ's decision in light of the new evidence. *Id.*; Fed. R. Civ. P. 60(b); 20 C.F.R. §§404.987-404.989, 416.487-416.1489. *See also Bolden for Bolden v. Bowen*, 868 F.2d 916, 917 (7th Cir. 1989).

### 1.     The ALJ's Reliance on the Opinion of a Non-Examining Physician

Jackson argues that the ALJ improperly relied on the opinion of Dr. Gonzalez, a non-examining physician, in assessing her residual functional capacity. Pl.'s Mem, pp. 5-6. She cites Social Security Ruling 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996), for the proposition that a consulting physician's findings of fact must be treated as expert opinion evidence from non-examining sources. Pl.'s Mem., pp. 5-6. Jackson concedes that the ALJ may not ignore these opinions, but argues that he should weigh them only insofar as they are supported by evidence in the record. *Id.*

A consulting physician's report may be substantial evidence supporting a finding of no disability even if it contradicts the views of the claimant's treating physician. *Richardson*, 402 U.S. at 402. However, a treating physician's opinion regarding the nature and severity of a medical condition should be accorded controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. §404.1527(d)(2); Soc. Sec. Rul. 96-2p). Courts should give more weight to the opinions of treating physicians because they are more likely to "provide a detailed, longitudinal picture of [a claimant's] medical impairment[s] and may bring a unique perspective to the medical evidence" that non-treating physicians, or other objective evidence, cannot. 20 C.F.R. §404.1527(d)(2). At the same time, "the opinion of a specialist about medical issues related to his or her area of specialty" should be weighted more heavily than opinions of non-specialists. 20 C.F.R. §404.1527(d)(4). In all cases, the ALJ must provide adequate reasoning for the weight he gives to a treating physician's opinion. 20 C.F.R. §404.1527(d)(2). *See also* Soc. Sec. Rul. 96-2p.

17

In this case, the ALJ followed the functional capacity assessment completed by Dr. Gonzalez and found that Jackson could perform work at the medium level. He then concluded that her past relevant employment as a customer service representative constituted such medium level work and that she could sit for up to six hours during a regular eight hour work day and stand and walk for one hour during the day. (R. at 23, 25.) Jackson argues that the ALJ should not have relied on Dr. Gonzalez's opinion because it was not supported by the evidence. The Court agrees.

In reaching his conclusion about Jackson's abilities, Dr. Gonzalez relied on some notes from Jackson's physical therapy sessions, "sketchy notes" from Dr. Loftin, and Dr. Koo's finding that Jackson suffers from back pain, peripheral neuritis in both lower extremities, and hypertension. Def. Mem., p. 6. (R. at 190.) However, Dr. Gonzalez failed to provide any explanation as to how or why this evidence supported his conclusion that Jackson could lift up to 25 pounds frequently and up to 50 pounds often, and that she could sit and stand for approximately six hours in an eight hour workday. In fact, he acknowledged that he did not review any treating or examining source statements regarding Jackson's physical capacities, (R. at 197), and neither Dr. Loftin nor Dr. Koo made any similar findings regarding Jackson's abilities. Thus, it is unclear how Dr. Gonzalez formed his opinion at all and the ALJ erred in according it improper weight. The mere fact that Dr. Gonzalez checked various boxes on a pre-printed form indicating that Jackson could perform medium work does not render his unexplained opinion substantial evidence of Jackson's abilities. *See, e.g., Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (treating physician's opinion not entitled to controlling weight where she merely answered "yes" in response to a pre-typed question).

18

## 2. The ALJ's Finding Regarding Jackson's Residual Functional Capacity

In a related argument, Jackson claims that the ALJ erred in determining that she maintained the residual functional capacity to perform medium work. Pl. Mem., p. 7. She argues that the ALJ failed to build an accurate and logical bridge between the evidence and this conclusion, and that he did not properly consider her evidence of pain.

It is well-established that an ALJ must build an accurate and logical bridge between the evidence and his conclusions. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (reversing ALJ's decision where "the reasons given by the trier of fact d[id] not build an accurate and logical bridge between the evidence and the result"). Jackson contends that the ALJ failed to build such a bridge in assessing her functional capacity because he "cherry pick[ed]" portions of the physical therapy notes and medical records that described her condition as "improved" while omitting the portions that noted her continuous limitations. Pl. Mem., p. 11. The Court agrees.

In his decision, the ALJ noted that Jackson had nine physical therapy sessions through January 14, 1998, and that she showed good lifting technique at the time of discharge. He pointed out that she had increased her spinal range of motion by 50 percent, that her posture had improved from poor to fair+/good, and that her pain had decreased from 8/10 to 3-6/10. However, the ALJ failed to mention that Jackson's continuing pain woke her up twice a night, even with medication, and that she used a lumbar roll at home to help her sit. (R. at 172.) And he did not discuss the physical therapist's remarks that Jackson only felt relief from the pain by taking medication, and that she had not achieved the treatment goals of "good unsupported sitting posture" and full extension range of motion. (R. at 201.)

19

With respect to Dr. Rathi's examination, the ALJ cited the portion of his report stating that Jackson was in "no apparent distress" and interpreted that to mean that Dr. Rathi did not find Jackson to be in severe pain. However, the ALJ did not mention Dr. Rathi's impression, based on the MRI of 1998, that Jackson suffered from chronic lower back pain, most likely secondary to muscle spasm. Nor did he mention Dr. Rathi's recommendation that Jackson have an EMG of the lower extremities for further evaluation of the chronic lower back pain, or that the EMG showed that Jackson had mild bilateral lumbosacral radiculopathy, poorly localized. (R. at 239, 252.) The ALJ also failed to mention that Dr. Rathi advised Jackson to continue taking Flexeril and Naprosin, as needed, to control her back pain. On balance the Court finds that the ALJ improperly selected certain portions of the medical records while failing to consider other conflicting evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (reversing and remanding ALJ's decision where she mentioned "only the medical evidence favoring the denial of benefits").

Jackson also argues that the ALJ failed to properly consider her evidence of pain. A claimant's subjective symptoms such as pain must be supported by medical and laboratory findings establishing the existence of some anatomical or physiological abnormality which could reasonably be expected to produce them. *See* 20 C.F.R. §404.1529. If the underlying requisite impairment is established, the ALJ must consider a claimant's statement about the intensity, persistence, and functional effects of her symptoms to the extent those symptoms are credible. 20 C.F.R. §404.1529(c)(4). Where, as here, the claimant indicates that pain is a significant factor in her alleged inability to work, the ALJ must obtain a detailed description of the claimant's daily activities by asking her specific questions about the pain and its effects. *Clifford*, 227 F.3d at

872. Factors that must be considered include "the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities." *Id.* (citing *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)).

In this case, the ALJ did not explain why the objective medical findings do not support Jackson's complaints of disabling pain. For example, he did not address the fact that Dr. Loftin refused to release Jackson to work on May 21, 1998 but instead prescribed her Flexeril and referred her for more physical therapy. And as noted, the ALJ did not even mention the May 4, 1999 EMG report which showed radiculopathy. The ALJ cites portions of Jackson's medical records and her daily activities as substantial evidence that she does not suffer disabling pain. But the record is replete with instances where Jackson sought treatment for back pain, and she was routinely prescribed pain medications. In June 1999, one of the examining physicians, Dr. Yuk, even recommended that Jackson undergo steroid injections to control her pain. The ALJ did not mention this recommendation in determining that Jackson's pain was controllable with medication. He also failed to explain how either taking or not taking the medication, which made her drowsy, would affect her ability to work.

The Commissioner asserts that the ALJ's finding was supported by substantial evidence because Jackson suffered from lumbar strain which is not reasonably expected to produce pain of a disabling magnitude. In fact, Dr. Rathi diagnosed Jackson with chronic lower back pain in March 1999. And an EMG[11] revealed that she suffered from radiculopathy which can cause

---

[11]     Jackson's more recent EMG of August 9, 2000 is not part of the record before the Court, but it does reveal the same radiology findings as the report of May 4, 1999.

significant pain. Jackson consistently complained that she can only sit for a maximum of twenty minutes and that prolonged sitting causes her pain. Furthermore, Jackson testified that she does not do any household chores apart from cooking food on a microwave and a table top grill, and that she requires her daughter's help in order to prepare meals, shop, and do laundry. Thus, her activities are quite limited and are not inconsistent with a finding of disability.

The Commissioner also argues that Jackson's treatment history demonstrates that she did not suffer from disabling back pain because she was never hospitalized for that condition. Def.'s Mem., p. 9. However, the Commissioner does not cite any authority indicating that the existence of back pain depends on whether a person is hospitalized for that condition. For his part, the ALJ improperly substituted his own judgment for that of the medical evidence when he concluded that Jackson's treatment history was "entirely conservative" and inconsistent with her complaints of pain. (R. at 24.) *See Rohan v. Chater,* 98 F.3d at 971 (ALJ erred when he "simply indulged his own lay view" for that of the treating physician); *Herron v. Shalala*, 19 F.3d 329, 334 n.10 (7th Cir. 1994) (ALJs must not succumb to the temptation to play doctor and make their own independent medical findings). Thus, the ALJ erred in rejecting Jackson's evidence of pain in determining that she had the residual functional capacity to perform medium work. And the VE testified that if Jackson's complaints of pain were accurate then she would not be able to perform her past work as a customer service representative – the only position available to Jackson given her age, education and background. (R. at 306-07.) As a result, the Court finds that the ALJ did not build a logical bridge between the evidence and his conclusion that Jackson can return to her prior job.

### 3. The ALJ's Dismissal of Jackson's Diabetic Neuropathy Condition as Non-Severe

Jackson's third and final argument is that the ALJ erred in dismissing her diabetic neuropathy as being non-severe and in failing to consider the effect of her diabetes in combination with her other impairments. Pl. Mem., p. 11. The Commissioner claims that the ALJ did consider all of Jackson's impairments, including her diabetic neuropathy, in determining that she had a severe impairment at step two of the sequential analysis. However, Jackson did not have any functional limitations as a result of the diabetic neuropathy. Def. Mem., p. 5.

A review of the record reveals that the ALJ did discuss Jackson's diabetic neuropathy and found that it did not affect her ability to stand and walk. The ALJ noted that Jackson had complained of blurred vision because of her diabetes, but he found it significant that Dr. Rathi did not find serious abnormalities with her eyes. In addition, Dr. Loftin's medical report did not reveal any details about a visual examination even though Jackson complained to him about blurry vision. At the same time, Jackson complained about her eyes on more than one occasion. Dr. Loftin's records, for example, reveal that in August 1996, she complained about feeling "a hair" in the outer corners of both eyes since June 1996. On July 23, 1998, Dr. Loftin referred Jackson to Dr. Raiff for an ophthalmological examination because he found that "she had suspicious optic nerve (glaucoma)." (R. at 203.) And Dr. Loftin's notes of May 22, 1999, indicate that his nurse was trying to obtain a referral for an "eye doctor" from Jackson's insurance company. (R. at 269.) There is no evidence in the record that Jackson had a visual acuity evaluation, but it is clear that she was seeking treatment for her vision problems.

It appears that the ALJ drew negative inferences from the absence of an ophthalmological evaluation in either Dr. Loftin's or Dr. Rathi's records. However, Dr. Loftin's nurse was trying to obtain a referral for an "eye doctor" from Jackson's insurance company. And while it is not clear whether an ophthalmologist would find neuropathy in Jackson's eyes, it is the ALJ's obligation to develop a full and fair record. The Court thus finds that the ALJ did not sufficiently develop the record with respect to Jackson's complaints of blurred vision.

## CONCLUSION

As stated above, the Court finds that the ALJ's conclusion that Jackson can do relevant past work is not supported by substantial evidence in the record. The ALJ gave improper weight to a non-examining physician's incomplete form and failed to explain how he came to the conclusion that Jackson can return to her prior employment despite an unsuccessful attempt to do so in April or May 1998. In addition, the ALJ did not properly consider the aggregate effect of Jackson's back pain, or how her diabetes, hypertension, or the various medications she takes for her array of physical symptoms affect her residual functional capacity and her ability to control her pain. Finally, the ALJ did not sufficiently develop the record with respect to Jackson's complaints of blurred vision. Thus, the ALJ failed to build a logical bridge between the evidence and his ultimate conclusion that Jackson can return to her prior job.

The ALJ's decision is reversed pursuant to 42 U.S.C. §405(g), and this action is remanded for further proceedings consistent with this opinion. The parties' motions for summary judgment (Docket Entry #2-1 and 14-1) are both denied.

NAN R. NOLAN
United States Magistrate Judge

Dated: May 1, 2003

24